Judge Marshall
delivered the Opinion of the Court.
This was an action of trespass brought by Eliza, a woman of color, claiming to be free, against Tevis, by whom she was claimed and held as a slave.
To reverse a judgment rendered for the plaintiff, Tevis has appealed to this Court. And the principal questions now to be considered, are whether the Circuit Court erred in overruling the defendant’s motions — first, for a continuance; and, second, for a new trial.
It is necessary to a correct understanding of the grounds of each of these motions, that the principal facts proved on the trial should be stated.
The plaintiff claims her freedom under the will of Cloe Penn, who, about the year 1805, had come to Kentucky, bringing with her the negroes Nell and her daughter Nann, whom she claimed as her own, and continued to hold, claiming them and the after-born children of Nann, as her own, until her death in the early part of 1813. In May, 1813, her will emancipating Nell and Nann and the children of the latter then born, of whom the plaintiff was one, was duly proved and admitted to record in the Jefferson County Court. The executor named in the will assented to the freedom of the slaves, who went at large as free persons for about five years, during a great portion of which they lived in the State of Indiana, until about the year 1818, being alarmed by a rumor that they might be kidnapped there, they returned to Kentucky, and afterwards, in the year 1818 or 1819, were taken into possession by Tevis. Such was the plaintiff’s evidence; and it was obviously sufficient in the absence of other proof to establish her right of freedom.
*395 On the other hand, it was proved by the defendant, that Cloe Penn was the wife of Benjamin D. Penn; that, after they had cohabited as man and wife for between twenty and twenty five years, in the State of Maryland, she left him and came to Kentucky, bringing from his possession the two slaves Nell and Nann, who are spoken of by the witnesses as having been owned by him. That Penn remained in Maryland until his death in November, 1807; that he left no child, and died intestate, leaving, as his heirs, a brother and seven sisters; that, in February, 1808, letters of administration on his estate were granted to E. Burgess, in the State of Maryland; whose report and settlement with the court of probate, in 1816, showed a surplus of the personal estate for distribution of one hundred and thirty nine dollars and fifty six cents; to one half of which the widow was said to be entitled.
Extracts from certain statutes of Maryland were also read by the defendant, and form a part of the record; from which it appears — first, that the slaves of a decedent in Maryland are, with other personal property to be included in the inventory by the executor or administrator, and to be assets in his hands; and, second, that if an intestate leave no child or descendant, but a widow, and brothers and sisters — as in the present case — the widow shall be entitled to one half of his estate, and the brothers and sisters to the other.
As to the cause of the separation between Penn and wife, one only of the defendant’s witnesses undertakes to speak, and she, in a direct answer to an interrogatory by the defendant, says, she understood Penn took to drink, and treated his wife badly.-
As to the manner and circumstances of the separation, several of the defendant’s witnesses say, she went off in the night with another man; but it does not appear that any of them had, or pretended to have, any personal knowledge of the circumstances, unless it be Penn’s brother-in-law, King; who, in answer to the question “ when and how she left her husband,” says — “ In or about the year 1805, she left him and went off in company with a certain William Stewart — they went, off in *396 the night, taking the negroes Nell and Nann with them.” The same witness, in answer to the further question— “How was it, and under what circumstances? Did she elope from him or not?” says “she did elope from him. Deponent was sent for, on the night that she eloped, by her husband, who told him he expected that she would take the negroes that night, and go off, and was afraid some person would come that night and steal the best horse he had, to take her off on, and requested the witness to watch at the stable (to which it was expected that the horse would run, if there was an attempt to catch him in the pasture,) to prevent it; but the horse was that night taken without coming to the stable.”
The use of the word ‘ eloped’ by this witness, in answer to a second, and in regard to that word, a leading interrogatory, as to the manner of Mrs. Penn’s leaving her husband, proves nothing conclusive; and whatever unfavorable inference might arise from the mere fact, that she left her husband’s house in the night, with another man, may be repelled by the absence of all other proof, or even intimation, of any improper connection or intimacy between her and Stewart, either before she left Maryland, or after she arrived in Kentucky, and by the positive proof of her good character and piety while she lived in this State. It is to be remarked, however, that while it is not very clear that this witness arrived at the house of Penn before Mrs. Penn had left it, with a view of going off, it is evident that he was not sent for until after her determination to go off, and to carry Nell and Nann with her, was known to her husband. And it is a circumstance entitled to great weight, that while Penn sent for his brother-in-law, in order to have his aid in preventing the abduction of a horse, he neither expressed any solicitude, nor took any measures to prevent his wife either from going herself, or from taking with her the two slaves; nor did he suggest the slightest objection to either — although he seems to have anticipated that she was going to a distance; it is not an irrational mode of accounting for this circumstance, to suppose that, as he had caused, so he had consented to, the separation; and that he gave up the two negroes — perhaps by a valid *397 act — to his wife, whom he was still bound to support; or that he permitted her to take them, for the purpose of enabling her to maintain herself, and as her share of his estate; or, because she had, or was supposed to have, some claim,legalor equitable, which was admitted as a sufficient ground for her taking them into her exclusive possession, when she was going forth from the protection of her husband, and freeing him from the immediate burthen of supporting her.
It further appears that, during about two years which elapsed from the separation until the death of Penn, although he sometimes talked of going to Kentucky in search of his wife, he not only made no attempt to retake the two slaves, but never spoke of them, nor in any manner indicated any design to reclaim them, or to separate them from his wife.
His administrator, who was appointed in 1808, and lived until 1823 or 1824, was alike silent and alike acquiescent. And his heirs, who would have been entitled to share these slaves and their increase with Mrs. Penn, if they were not absolutely hers, do not appear to have asserted, or suggested, any such claim during the life of Mrs. Penn, or for about five years after her death; nor does it seem probable, from any thing in this cause, that they would then or since have asserted any, had not the defendant — conceiving that Mrs. Penn’s title was insufficient to secure the freedom of the ne-groes whom she attempted to emancipate, and apprehending that they might be kidnapped — employed the agency of a person who was going to Maryland, to seek out the heirs of Penn, and purchase up their claim or interest in the negroes, for the joint benefit of himself and the agent. Transfers were accordingly obtained, in the early part of the year 1818, from six of the heirs resident in Maryland and Ohio, of their interest in the ne-groes, at the cost of about one hundred and sixty dollars; and Tevis having shortly afterwards, at the price of five hundred dollars, acquired the interest of the agent who had procured the transfer, he emancipated Nell and Nann and one of the children of the latter, and took possession of the rest as slaves. At that time Nann had *398 five children, and, according to the proof, the whole of them must have been worth more than two thousand dollars.
After a long acquiescence in an existing state of things, the law does not favor a change: it indulges every rational presumption against those who attempt to assert stale claims , when they have notbeenignorant of their rights ; and it will permit a jury — especially where the right of which a party is in the enjoyment,isnot inconsistent with justice to others —to lay hold of any rational, con sistent presumption which goes to show that the right was valid in its- origin, or subsequently affirmed:
*398 It was moreover proved by the defendant’s witnesses, that Penn was well off, though not rich; that before the separation, he had four or five negroes besides the two taken by his wife; and it may be inferred, that he owned the tract of land on which he lived. Under these circumstances, it was natural that, on a separation taking place between himself and his wife, some arrangement should have been made by which she should receive the benefit of a portion of the property. And regarding her rights as a wife, and those to which she might (and in fact did) become entitled as widow, the two negroes, even with the addition of the horse, were not more than might have been reasonably assigned to her, for her separate use and maintenance. There is, it is true, no direct proof that such an arrangement was made, nor is it disproved, though denied by witnesses who do not pretend to have personal knowledge of what passed when the separation was determined on, or assented to. But the intrinsic probability and justice of such an arrangement, coupled with the acquiescence of Penn in the expected departure of his wife with the negroes, tends to prove that it was in fact made. The inference is strengthened by his subsequent acquiescence, and by that of his representatives after his death. And receives additional support from a consideration of the very small sum for which the heirs, on application, transferred such interest as they had, or as it was represented to them that they had. The price which they agreed to take conduces to show that they did not consider, and did not mean to assert, that they had a valid and effectual claim.- And it being evident that Penn and his administrator and heirs knew, or were well satisfied, that Mrs. Penn was in Kentucky with the slaves, the mere non-residency of the parties, does not rebut the inference arising on the facts above stated.
These facts tend to establish, and would authorize a jury to assume and act upon any presumption, not inconsistent with the direct evidence in the cause, which *399 might be necessary to sustain a right to personal property, so long acquiesced in. The law does not favor a change in the condition of things after such an acquiescence unaccounted for. On the contrary, if the parties interested in producing a change, being competent to act for themselves, and acquainted with their rights, omit for a long time to assert or even intimate a claim, the law will allow of every rational presumption against it, when it is afterwards brought forward. And more especially, when the existing state of things is found to be accordant with reason and justice and the substantial interests of all the parties, will the law permit a jury to lay hold of any rational and consistent presumptión, which would show that it had either a valid commencement, or a sufficient subsequent confirmation. If then, it be even admitted, that the negative evidence of the defendant’s witnesses, which, under the circumstances, does not appear to be more than a mere opinion, might be sufficient to repel the presumption, that the slaves Nell and Nann were effectually settled on Mrs. Penn, either before or at the time of her leaving her husband; and if it be assumed that she left her husband, and brought off the slaves, without his consent, and without any arrangement by which she was to have them as her portion of his estate; still, as the two negroes do not appear to have been more than a reasonable allowance for her separate support, during the life of her husband, nor more than the one half of his estate, to which she was entitled at his death, up to which time there seems to have been no addition to their number; and as the husband acquiesced in this de facto division of his estate during his life, and as his administrator, having, as is shown in this record, a sufficiency of assets to meet the demands of creditors, also acquiesced, without any effort to gain the possession, or in any manner to control these negi’oes, until his death, in 1323 or 4; and, as the brother and sisters were left by Mrs. Penn, to the uninterrupted enjoyment of the real estate, while they also acquiesced in the separate enjoyment of these negroes by her, or under her title, for ten years; and as, looking to the price which they then took for them, they can *400 scarcely be considered as asserting claim to a valid interest in them, even then — it seems to us, that the circumstances authorize the presumption — first, that the administrator renounced any title which may be supposed to have vested in him, and assented to the possession and title of Mrs. Penn, or at least admitted the right of herself and the other distributees, whose transfer to Tevis was neither known nor assented to by him; and, second, that the heirs having, in the separate enjoyment of the real estate, an indemnity for the separate enjoyment of these negroes by Mrs. Penn, or finding, in the acts or conduct of Penn, a sufficient foundation for her right, or a sufficient motive for allowing it, therefore assented to and acquiesced in her separate possession and claim of ownership.
A colored person sues for her freedom, which she claims by virtue of an emancipation by will, and which she had actually enjoyed for several years, and until she was seized by the defendant, who claimed her by purchase from those whose title he supposed to be superior to that of the emancipator: ifhe had bro’t suit against the emancipator, in her life time, for the slave, the facts proved on the trial in this case, would have justified a verdict against him: — held, that the plaintiff, in support of her right to freedom, is entitled to the benefit of the same facts, un-impair’d by time —ten or twelve years having elapsed after her seizure before her suit was brought: she having remained in slavery during all that time, and in infancy during the greater part of it.
These observations apply to the state of things existing at and before the time when Tevis took possession of the negroes, in 1818, under his purchase from a portion of Penn’s heirs. And, if instead of being enabled to gain the possession then by seizure, he had been compelled to resort to a suit, against a purchaser from Mrs. Penn, we think the presumptions which have been stated would have been sufficient to sustain a verdict or decree repelling his claim. And as the plaintiff has been held in slavery ever since, and was, moreover, an infant under twenty one years of age during a large portion of the interval from 1818 until the commencement of this action, it seems to us, that she is now entitled to the benefit of all the presumptions in favor of Mrs. Penn’s title, which might have been applied in support of a purchase from Mrs. Penn. If she was free then, she is free now. If the facts then and previously existing, as now proved in this cause, would have authorized a'verdict in favor of her freedom then, the same facts must be sufficient to sustain a similar verdict now, unless their effect has been repelled by other facts which have since occurred. Has any fact subsequently occurred which is entitled-to such an effect?
25 years after the death of the original owner of the slaVes bro’t from Md. to Ky. and emancipated (vide note, page 394,) the deft, obtained administration of his estate in the c’ty where the slaves then were, and, two years after that, in the county where they were at the time of his death.— There were then no debts oi.the decedent to be provided for: no necessity for reducing the emancipated slaves to assets ; & these grants of adm’n were obviously obtained merely to strengthen the deft’s title: held, that his claim of an adm’rs rights, is not entitled to any influence upon the slave’s right to freedom; and no error in rejecting the letters of administration when offered as evidence. Motion for a con tinuance, on the ground that the party can prove certain facts, but did not know that they were impor tant, till he was advised of it by counsel, when it was too late to procure the evi deuce : as the cause had been pending 2 years, this court will not decide that there was any abuse of discretion in refusing the contin uance — especially, where the object was to prove •facts inconsistent with a state of ease, favorable to the adverse party, of which there was no sufficient .proof.
*401 The only facts attempted to be relied on, for this purpose, are the grants of administration to Tevis, first by the County Court of Shelby, in 1832, and afterwards, by the County Court of Jefferson, in 1834, which were offered as evidence on the trial, but rejected by the Court. Were these grants of administration entitled to any effect favorable to the defendant? We are of opinion that they were not.
The first of them was not made until about twenty five years after the death of Penn, nor until sixteen years after his administrator in Maryland had paid all known debts, and had a balance of the personal estate left for distribution; nor until after these negroes had remained, for more than ten years, under the title of Mrs. Penn, who was one of the distributees, and for fourteen years in possession of Tevis, claiming them under other distri-butees. There is no pretence that new demands had appeared against Penn’s estate, or that any other circumstance had occurred which rendered it necessary or even proper to appoint an administrator here. And it is obviously to be inferred that administration was applied for, not because it was then requisite or proper that the negroes should be reduced to the condition of assets; but for the purpose of strengthening the title of the claimant under one set of distributees, against that of the claimants under another. The grant of administration, under the circumstances, furnishes no evidence that the negroes had not been distributed; and did not ipso facto withdraw the title from the distributees, under some of whom the possession had gone for twenty five yeai’s. The case, as to this question, is precisely the same as if Mrs. Penn had lived and continued in possession until 1832, and Tevis, claiming under the other dis-tributees, had then obtained letters of administration, as a means of gaining the possession. And it might as well be supposed that the title could be affected by the mere grant of administration at the end of one hundred years after the estate had been settled, all debts paid, and the distributees in possession, as that, at the end of twenty five years, and after the facts which had occurred, the grant of administration to Tevis, could affect the title, *402 or the presumption of title, as demonstrated by the preexisting facts. The Cpurt did not err in excluding this testimony. And there is enough, either with or without it, to sustain the verdict.
In a suit for freedom,claimed un der a will — deft, relying upon a title alleged to be superior to that of the testator— when the pltf. had proved that the emancipator was a feme sole, ■and possessed of pltf. claiming her in her own right, at the date of the will, and at her death,it devolv’d on deft, to show that the emancipator had not the absolute right , when the will took effect.
*402 It may be proper, in connection with this view of the evidence, to notice the motion for a continuance, which was founded on, the affidavit of Tevis, stating his belief that he could prove by King, who had already deposed in the cause, that, although Penn had several ■ negroes before his wife left him, he had none except Nell and Nann at the time of his death; and that he had not known the importance of proving this fact, until informed by his counsel, on the day before the motion was made. As the cause had then been depending more than two years, we could not say that the Court abused á sound discretion in refusing the continuance for the purpose of giving an opportunity to prove the fact alleged, even if direct proof of the fact were more important than it appears to be. But, although it would undoubtedly have strengthened the presumptions in favor of the plaintiff, if it had appeared that the distributees of Penn in the State of Maryland, had received negroes of his estate after his death; yet there is no direct proof of that fact, and as the jury would not have been authorized to infer it from the evidence which was before them, we do not perceive that the defendant could have derived any material advantage from disproving it. The presumption arising on the facts, is that, if Penn had any slaves at the time of his death, they were included in the inventory, and their value, except the small fund left for distribution, exhausted in the course of administration.
It is not sufficient, however, that there was no error in the opinions of the Court in overruling the motion for a continuance, and in rejecting the evidence offered by the defendant; nor is it sufficient that the verdict was authorized by the evidence. If, in giving or refusing instructions, the Court committed any error by which the jury may have been misled, in giving effect to the evidence, the defendant was entitled to a new trial.
The real point of the issue was, whether the plaintiff *403 was the absolute property of Mrs. Penn, at the time oí her death. And, as it was indisputably proved, that Mrs. Penn was then, and at the date of her will, a feme sole, having the plaintiff in her possession, and claiming her as her property, it devolved upon the defendant to show that Mrs. Penn was not the absolute owner of the plaintiff, and in default of such proof the jury was bound to find her free under the will. And this, in substance, was the only instruction given on motion of the plaintiff.
The court having instructed the jury as to the right of succession to slave property in ]Wd. as proved on . the trial; and, also, that the separation of a wife (not divorced) from her husband, does not enable her to acquire and hold property in her own right, during his life — added, “ that personal property may be held in bust for the wife during the life of tho husband, & she may ,in such case, have the use of it, and at her death dispose of it, without the-control or consent of the husband : ” held, that this qualification of the instructions was justified by proof that the wife had left her husband in Md., come to Ken. with the property in contest, & had hold and enjoyed it as her own, for sev eral years, both before and after - his death.
The Court also instructed the jury, on motion of the defendant, “ that, by the laws of Maryland, which govern the case, slaves are personal property,” and “that upon the death of an intestate, the title to them vests in his administrator, and that persons entitled to distribution cannot dispose of any particular slave, either by deed or will, till distribution is made, or partition of the slaves has ascertained to whom each particular slave shall belong in severalty.” The jury were also instructed, on motion of the defendant, “ that a wife separating from her husband, and living apart from him, unless legally divorced, did not enable her to acquire or hold personal property in her own right, during his life:” to which the Court added, “ that personal property may be held in trust for the wife during the life of her husband, and she may, in such case, have the use of it, and at her death, dispose of it without the control or consent of her husband.” It is objected that this qualification was calculated to mislead the jury, by directing their attention to a state of case which the evidence did not conduce to prove. We are of opinion, however, as before intimated, that the separate and undisturbed possession and claim of the slaves by Mrs. Penn, during the life of her husband and afterwards, conduced in some degree, to prove that she had, even during his life, some separate right to them in some mode. And therefore, we cannot say that the Court erred in qualifying the general negation of her right, by pointing out a mode by which it might exist, and which, although the presumption in favor of it may not be very strong, is not disproved by the evidence..
No error in refusing instructions ■which were included in some already given ; nor those which are irrelevant.
In the case stated, ante p. 394, it is not necessarily the fact that the children bom of the female slaves after the separation of the husband & wife, were the property of the husband : instructions that they were so, were properly refused, for reasons stated in the opinion.
The first, fourth and fifth instructions asked for by the defendant, were overruled; but as the first, so far as it has any practical application to this case, is included in the first branch of that which has been just considered, and as it is, moreover, subject to the same quailification, the defendant was not prejudiced by its refusal. The fifth — which merely declares that the plaintiff’s color is presumptive evidence of slavery — has evidently no bearing on the question whether she belonged to Mrs. Penn, or to some other person.
And the fourth is objectionable in several particulars: first, because it assumes that, if Nell and Nann were the property of Penn when his wife left him, their children born after-wards were also his, which is not a necessary legal consequence, and especially as it does not appear that any children were born of Nell or Nann after the separation of Penn and wife, and before the death of the former. Second, because it excludes the presumption that Penn parted with his right in these slaves, for the use of his wife. And, third, because it seems to assume that there is no proof which would authorize the conclusion, that Mrs. Penn had acquired an exclusive property in the slaves before her death. For these reasons, and because the first instruction above stated as being given on motion of the defendant, included all that is material and correct in this, the Court did not err in refusing to give it.
We are of opinion, therefore, that the case having gone to the jury without prejudice to either party from the opinions of the Court, and the evidence having been such as to authorize the jury to find for the plaintiff — it was not the duty of the Circuit Court to grant a new trial. And this is not a case in which we should be justified in directing a new trial, in opposition to the opinion of the jury and the Circuit Court.
Wherefore, the judgment is affirmed.